UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| ALLSTATE INSURANCE COMPANY, | ) | |
|---|---|---|
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 3:13 CV 1182 |
| | ) | |
| DAVID L. CANELL, Deceased, ESTATE OF DAVID L. CANELL, and ANGELA CAMPOLI, | ) ) ) | |
| | ) | |
| Defendants. | ) | |

**OPINION and ORDER**

I. **BACKGROUND**

In 2011, David Canell was an aging veteran with congestive heart failure. (DE # 53-5 at 4, 7, Campoli Dep. 18, 21.) Canell was on a wait list for hospice care, so his family decided to hire defendant Angela Campoli to care for Canell in his home. (DE # 53-5 at 3-4, Campoli Dep. 17-18.) Campoli first met with Canell's three daughters on September 20, 2011, at Canell's residence to discuss the caretaking responsibilities that Campoli was to perform. (*Id.*) On that date, Canell was introduced to Campoli and it was explained to him that Campoli would be taking care of him. (*Id.* at 5, Campoli Dep. 19.)

The next day, Campoli arrived at 5:00 a.m. and let herself in with a key left for her in a lockbox. (*Id.* at 8, Campoli Dep. 22.) As she approached, she heard yelling from inside the residence. (*Id.* at 9, Campoli Dep. 23.) When she unlocked the door, she saw Canell laying on the floor in the living room. (*Id.* at 10, Campoli Dep. 24.) Campoli helped Canell off the floor and placed him in his recliner. (*Id.*) Campoli told Canell who

she was, that they had met the day before, and that she was there to help take care of him. (*Id.* at 11, Campoli Dep. 25.) Canell said, "Thank God you're here." (*Id.*)

Canell asked to go to his bedroom, but then proceeded to veer towards the kitchen in his walker. (*Id.* at 12-13, Campoli Dep. 29, 32.) Campoli asked him if he wanted something to eat, but he said no, that he wanted to go to his bedroom. (*Id.* at 13, Campoli Dep. 32.) Canell proceeded down the hallway in his walker, and sat down on his bed. (*Id.* at 13-14, Campoli Dep. 32, 34.) Canell was seated across from a six-dresser drawer, which had three drawers on each side. (*Id.* at 14, Campoli Dep. 34.)

Canell opened the middle drawer on the right side, pulled out a box marked "hearing aid batteries and hearing aid," and handed it to Campoli, but when Campoli asked him if he wanted his hearing aid, he said no. (*Id.* at 14-15, Campoli Dep. 34-35.) He then asked Campoli what the "white thing" was in his drawer; Campoli pulled it out, discovering that it was a memorial book for his wife. (*Id.* at 16, Campoli Dep. 36.) Campoli asked Canell if he wanted to look at it, but Canell said no. (*Id.*) Campoli replaced the hearing aid box and memorial book in the drawer and closed it. (*Id.*) At this point, Canell was starting to breath more heavily, was uncordial, was getting agitated and louder, was shaky, and was fidgeting with his hands. (*Id.* at 16-17, Campoli Dep. 36-37.) Campoli asked if he was ok, and he requested that Campoli bring him a glass of water. (*Id.* at 16-17, Campoli Dep. 36-37.) Campoli did so, and was gone from the room for about a minute. (*Id.* at 17, Campoli Dep. 37.)

As Campoli returned to the room, she saw Canell standing straight up at the dresser, having pulled open the top drawer on the right side. (*Id.* at 18, Campoli Dep. 38.) Campoli saw a revolver in the drawer on top of a stack of t-shirts. (*Id.*) Campoli spilled the water, and then set the glass down. (*Id.*) As she did so, Canell took the revolver into his hand. (*Id.*) Canell sat down on the bed, and put the gun to his head. (*Id.* at 19, Campoli Dep. 39.) Campoli was standing next to the dresser about two arms' lengths away, and said "Let's put that down, and we'll look at it later." (*Id.*) Canell told Campoli to "get the hell outta there." (*Id.*) Campoli went to reach for Canell's leg with one hand and the gun with the other hand. (*Id.* at 19-20, Campoli Dep. 39-40.) Canell said "get the hell outta here" and at the same time took the gun away from his head and pointed it directly at Campoli, waving it up and down between the height of Campoli's chest and stomach. (*Id.* at 32-33, Campoli Dep. 73-74.) Campoli stood straight back up, her leg and hand touching the side of the dresser, and could not move. (*Id.* at 20, Campoli Dep. 40.) Campoli claims that Canell then pulled the trigger while the gun was about an arm's length away from her. (*Id.* at 20-21, Campoli Dep. 40-41.) The bullet hit the dresser next to Campoli. (*Id.* at 21, Campoli Dep. 41.) Canell then put the gun to his head again. (*Id.* at 22, Campoli Dep. 42.) Campoli said, "You don't wanna do that. . . . No, no, no, you don't want to do that." (*Id.* at 23, Campoli Dep. 43.) Canell again said, "Get the hell outta here." (*Id.*)

Campoli stood there for a moment, realized there was nothing she could do for him, and ran to the kitchen to try to find the phone. (*Id.* at 23-24, Campoli Dep. 43-44.)

She realized it was in the living room near the recliner, so she went to the recliner, reached over it, and grabbed the phone. (*Id.* at 25, Campoli Dep. 45.) She heard the sound of Canell's walker behind her. (*Id.*) She turned to run out the door with the phone, but her left foot was stuck under the recliner. (*Id.* at 26, Campoli Dep. 46.) Campoli twisted and felt a snap in her lower back, and fell to the ground on her hands and knees. (*Id.*) Campoli crawled to the front door, and as she opened it she heard another gunshot. (*Id.* at 27, Campoli Dep. 47.) Once outside, she dialed 911. (*Id.* at 29, Campoli Dep. 49.) It is undisputed that Canell died of a self-inflicted gunshot wound that day.

Campoli sued Canell in Indiana state court for compensation for injuries to her back, leg, and knee from the fall, and for emotional distress. (DE # 1-2.) Plaintiff Allstate, the carrier for a homeowner's insurance policy purchased by Canell, brought the present declaratory judgment action in this federal forum against Campoli and Canell's estate ("the Estate"), and moved for summary judgment, asking the court to declare as a matter of law that it owes no duty to pay under Canell's policy. (DE ## 1, 34.) Allstate's argument is that the insurance policy excludes coverage from injury resulting from intentional or criminal acts of Canell. (DE # 34.) The Estate responded, arguing that a question of fact exists regarding Canell's intent. (DE # 65.) The motion is fully briefed and ripe for ruling.

4

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 56 requires the entry of summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). In responding to a motion for summary judgment, the non-moving party must identify specific facts establishing that there is a genuine issue of fact for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252 (1986); *Palmer v. Marion County,* 327 F.3d 588, 595 (7th Cir. 2003). In doing so, the non-moving party cannot rest on the pleadings alone, but must present fresh proof in support of its position. *Anderson,* 477 U.S. at 248; *Donovan v. City of Milwaukee,* 17 F.3d 944, 947 (7th Cir. 1994). A dispute about a material fact is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248. If no reasonable jury could find for the non-moving party, then there is no "genuine" dispute. *Scott v. Harris,* 550 U.S. 372, 380 (2007).

The court's role in deciding a summary judgment motion is not to evaluate the truth of the matter, but instead to determine whether there is a genuine issue of triable fact. *Anderson,* 477 U.S. at 249-50; *Doe v. R.R. Donnelley & Sons Co.,* 42 F.3d 439, 443 (7th Cir. 1994). In viewing the facts presented on a motion for summary judgment, a court must construe all facts in a light most favorable to the non-moving party and draw all

legitimate inferences and resolve all doubts in favor of that party. *NLFC, Inc. v. Devcom Mid-Am., Inc.,* 45 F.3d 231, 234 (7th Cir. 1995).

## III. DISCUSSION

Allstate seeks a declaration that it is not required to pay under two types of coverage, enumerated "X" and "Y" in the policy. Coverage X is entitled "Family Liability Protection" and Coverage Y is entitled "Guest Medical Protection." Both coverages contain an identical exclusion, which states that Allstate will not pay for any injuries:

> intended by, or which may reasonably be expected to result from the intentional or criminal acts or omissions of any insured person. This exclusion applies even if:
> a) such insured person lacks the mental capacity to govern his or her conduct;
> b) such [injury] is of a different kind or degree than intended or reasonably expected; or
> c) such [injury] or property damage is sustained by a different person than intended or reasonably expected.
> This exclusion applies regardless of whether or not such insured person is actually charged with, or convicted of a crime.

(DE # 1-1 at 43, 45; Policy at 19, 21.)

Allstate argues that both the exclusions for "intentional" acts and the exclusion for "criminal" acts apply in this case. However, neither party devotes more than half of a page to the criminal acts exclusions in any brief. (*See* DE # 34 at 14, DE # 66 at 11, DE # 65 at 24.) Because the parties, including the movant Allstate, have treated the criminal acts exclusions as an afterthought, the court declines to consider Allstate's motion as containing a serious request of a declaration regarding whether the criminal acts

6

exclusions apply in this case. Allstate is free to brief this issue in a more complete manner before the end of the dispositive motion period in this case, if it so chooses. For now, the court focuses solely on the question of whether the "intentional" acts exclusions apply in this case.

Because Canell is deceased, evidence regarding his subjective intent is largely unavailable. Perhaps realizing this fact, the parties focus, instead, on the issue of "inferred intent," or intent determined as a matter of law given the circumstances, regardless of subjective intent. Each side argues that the court should follow the rule stated in a different case from the Supreme Court of Indiana, both of which address the question of inferred intent, but which use different language and come to different conclusions given the facts at issue.

Allstate urges the court to rely on *Allstate Insurance Co. v. Herman,* 551 N.E.2d 844 (Ind. 1990). In that case, the insured fired a warning gunshot into the air in an apparent attempt to disperse a group of fighting people; as the group fled, he chased them and fired four more shots in the direction of the group and struck the plaintiff, Herman. Herman sued on the insured's homeowner's policy, which was issued by Allstate. *Id.* The insurance policy stated that Allstate would "not cover bodily injury or property damage intentionally caused by an insured person." *Allstate Ins. Co. v. Herman*, 542 N.E.2d 576, 577 (Ind. Ct. App. 1989) (appellate decision). The insured testified that "I intended to hurt somebody, I guess, if I emptied the pistol. . . . I don't know what I

intended. Everything just happened so fast. I don't know if I intended to hurt anyone." 551 N.E.2d at 845.

The Supreme Court of Indiana, in a relatively short opinion, held that "intentional" means "'volitional performance of an act with an intent to cause injury,'" but elaborated that intent to cause injury may be inferred as a matter of law. *Id.* The *Herman* court ultimately concluded that the insured's intent to injure could be inferred in that case because, when the insured shot bullets into a crowd, he engaged in conduct that "any reasonable person would deem calculated to cause injury." *Id.* at 846. Though the holding appeared to rest on inferred intent, the court also noted that there was "no doubt" that the insured "certainly had the [subjective] intention of shooting into the fleeing crowd with the intent to 'hurt somebody.'" *Id.* at 845. For these reasons, the court entered summary judgment in favor of Allstate due to the intentional act exclusion. *Id.* The dissent argued that, given the insured's statements, there was a genuine issue of material fact as to the insured's state of mind, and summary judgment should not have been granted. *Id.*

On the other hand, the Estate urges the court to rely upon a later case from the Supreme Court of Indiana, *Auto-Owners Insurance Co. v. Harvey*, 842 N.E.2d 1279 (Ind. 2006). In that case, two teenagers were engaged in sexual intercourse on a boat ramp when one of the teens, a 16-year-old girl, told her male companion to stop and the two stood up. *Id.* at 1281. The boy asked the girl what was wrong, but she did not answer and instead pushed him toward the water a few times. *Id.* When she came toward him

again, he put his hands on her shoulders and pushed her. *Id.* The girl lost her balance, fell off the edge of the ramp, down a rocky embankment into a river, and drowned. *Id.* The family of the deceased girl sued on the boy's parents' homeowner's policy, and the court examined another intentional act exclusion. *Id.* at 1282.

The *Harvey* court addressed the *Herman* decision, stating that *Herman* did not provide any criteria for inferring intent as a matter of law, nor did it squarely address whether conflicting evidence existed on the issue. The *Harvey* court summarized that "*Herman* is best understood to reflect that, under the specific facts and circumstances there presented, the majority was strongly convinced that there was 'no genuine issue as to any material facts' and that Allstate was 'entitled to judgment as a matter of law.'" *Id.* at 1290 (quoting Ind. Tr. R. 56(C)).

The *Harvey* court went on to hold that intent to injure can be inferred, regardless of subjective intent, "if the nature and character of the act are such that intent to cause harm must be inferred as a matter of law." *Id.* (quoting *PSI Energy Inc. v. Home Ins. Co.*, 801 N.E.2d 705, 723 (Ind. Ct. App. 2004)). The court further explained that "'even if the evidence demonstrates a disregard for safety,' such evidence is insufficient to warrant exclusion for expected or intended injuries." *Id.* at 1290-91 (quoting *PSI Energy*, 801 N.E.2d at 728). Rather, the inference "'applies only where reason *mandates* that from the very nature of the act, harm to the injured party *must* have been intended.'" *Id.* at 1290 (quoting *PSI Energy,* 801 N.E.2d at 728, emphasis in *Harvey*).

The insurer in *Harvey* argued that the dimensions of the boat ramp, the boy's awareness of the girl's proximity to the edge, the boy's awareness of his own size and strength, and the fact that the boy's push in fact caused the girl to fall into the river where she ultimately died, required the court to infer intent as a matter of law. *Id.* at 1291. However, the Supreme Court of Indiana disagreed and affirmed the trial court's denial of the insurer's motion for summary judgment, holding that the evidence was "not so overwhelming as to mandate us to conclude that [he] must have intended to hurt [her]." *Id.*

The essence of both *Harvey* and *Herman* are the same: intent may be inferred as a matter of law where the circumstances are "egregious," *Herman,* 551 N.E.2d at 845 (internal quotation marks omitted), or the evidence "so overwhelming," *Harvey,* 842 N.E.2d at 1291, that an intent to injure should be inferred as a matter of law. *Harvey,* however, appears to present a slightly more stringent test, as it employs words like "*mandates*" and "*must.*" *Id.* at 1290 (emphasis in *Harvey*). It is the opinion of this court that the *Harvey* court, having authored the later decision and having devoted significant consideration to the issue including an analysis of *Herman*, presents the most current and thorough statement of the rule regarding inferred intent under Indiana law, and that the Supreme Court of Indiana would apply the *Harvey* standard if presented with this case.

A review of inferred intent cases from the Indiana Court of Appeals reveals a pattern consistent with both *Herman* and *Harvey.* In cases where the facts suggest the

possibility that the action was an attempt to warn others of the undesirability of their actions, the Indiana courts are less likely to infer intent to injure. *See, e.g., Sans v. Monticello Ins. Co.,* 676 N.E.2d 1099, 1104 (Ind. Ct. App. 1997) (question of fact existed regarding whether bartender's act of brandishing firearm at patron who re-entered bar after having been previously thrown out warranted inference of intent to injure); *Stout v. Underhill,* 734 N.E.2d 717, 719 (Ind. Ct. App. 2000) (owner shooting from distance of 120 feet at what he perceived to be "safe zone" in front of trespassers, who were digging yellow root from owner's land, did not warrant inference of intent to injure); *Auto-Owners Ins. Co. v. Stroud,* 565 N.E.2d 1093, 1096 (Ind. Ct. App. 1991) (homeowner's act of shooting gun at the lower portion of the door, after being awakened by someone attempting to get into his home, did not warrant inference of intent to injure); *Ind. Lumbermens Mut. Ins. Co. v. Brandum,* 419 N.E.2d 246, 247 (Ind. Ct. App. 1981) (ramming rear of another's car, after discovering that lover was riding in car with another man, did not warrant inference of intent to injure). These cases can be categorized alongside *Harvey*, where (as explained above) the Supreme Court of Indiana found that a teenage boy, having been pushed several times by his female companion, preemptively pushed her as she came towards him again. 842 N.E.2d at 1281.

By contrast, Indiana courts have found that actions pointedly directed at other people justify an intent to injure as a matter of law. *Heshelman v. Nationwide Mut. Fire Ins. Co.,* 412 N.E.2d 301, 303 (Ind. Ct. App. 1980) (punch with fist, even if in self-defense, warranted inference of intentional conduct; self-defense is relevant to ultimate liability

11

but not to question of applicability of intentional conduct exclusion); *Home Ins. Co. v. Neilsen, et al.*, 332 N.E.2d 240, 242 (Ind. Ct. App. 1975) (punch in face warranted inference of intent to injure). These cases are in line with *Herman*, which (as explained above) involved a man chasing a group of people and simultaneously shooting a gun at them after a warning shot had already been fired. 551 N.E.2d at 845.[1]

Under *Harvey* (the case that this court believes controls on this issue), intent to injure can be inferred "'only where reason *mandates* that from the very nature of the act, harm to the injured party *must* have been intended.'" *Id.* at 1290 (quoting *PSI Energy*, 801 N.E.2d at 728, emphasis in *Harvey*). The act in this case was Canell shooting a bullet from a gun in the same room as Campoli, with approximately an arm's length of distance between them. Reason does not mandate that, from the very nature of Canell's act, he *must* have intended to harm Campoli. Indeed, when taking the facts in a light most favorable to the Estate, reason could suggest other intentions on Canell's part; given the fact that Canell ordered Campoli out of the room, shot the gun, and ordered her out again, reason could lead to the conclusion that Canell's act of shooting was actually intended to motivate Campoli to leave the room so he could be alone, not to harm her at all. Perhaps firing a weapon with another person in the room suggests a disregard for the safety of the other person, but it does not "mandate" a finding of an intent to harm that person. *Id.* at 1290-91 ("a disregard for safety" is insufficient under

---

[1] Allstate urges the court to consider cases from other states and from federal district courts (DE # 34 at 13-14), but these cases are not controlling and consulting them is unnecessary where Indiana jurisprudence provides ample guidance.

*Harvey* to establish inferred intent). Taking the facts in a light most favorable to the Estate, Canell's act of shooting the gun in this case was more like firing a warning shot near trespassers, *Stout,* 734 N.E.2d at 719, or shooting a gun at a lower portion of a door concealing a suspected burglar, *Stroud,* 565 N.E.2d at 1096, and less like a direct punch in the face. *Heshelman,* 412 N.E.2d at 303; *Neilsen*, 332 N.E.2d at 1089.[2] Thus, the court finds that it is unable to infer as a matter of law that Canell intended to injure Campoli, and the court cannot determine as a matter of law that Allstate is free from its burden of providing coverage under the policy issued to Canell due to the intentional acts exclusions in the policy.

## IV. CONCLUSION

For the foregoing reasons, Allstate's motion for summary judgment is **DENIED**. (DE # 33.) Allstate has also filed a separate motion for summary judgment related to its defense of the Estate's bad faith counterclaim. (DE # 53.) As explained previously,

---

[2] The court would reach the same result if it followed the arguably less stringent *Herman* standard. In that case, the court suggested that intent to injure can be inferred when a person engages in conduct that "any reasonable person would deem calculated to cause injury." *Herman,* 551 N.E.2d at 846. While any reasonable person would probably deem firing into a crowd of 20-30 people an act calculated to cause injury, as was the case in *Herman*, reasonable people could disagree as to whether firing a gun into a dresser while approximately an arm's length away from another person was calculated to cause injury. As the court has explained, Canell did not simply shoot a gun. He first ordered Campoli out of the room, shot a bullet into the dresser, and ordered Campoli out again. Reasonable people could deem Canell's action as calculated to cause injury (*i.e.*, he actually aimed at her but missed), but reasonable people could also find that Canell merely intended to prompt Campoli to leave the room. Accordingly, even if the court determined that the *Herman* standard applied, intent could not be inferred as a matter of law under that standard either.

13

Magistrate Judge Nuechterlein bifurcated this case into two phases, and depending on the conclusion of the first phase, the second phase may be moot. Allstate's second motion for summary judgment is related to the second phase of this litigation, therefore the court **STRIKES** it. (DE # 53). Allstate may re-file its motion if appropriate after the conclusion of the first phase of this case.

**SO ORDERED.**

Date: September 22, 2015

 s/ James T. Moody  
JUDGE JAMES T. MOODY  
UNITED STATES DISTRICT COURT